# EXHIBIT A TO JOINT MOTION TO DISMISS

## PLAINTIFFS' POSITION CONCERNING *JOHNSON* AND OTHER FEE FACTORS

**I.     INTRODUCTION.**

The twenty-five percent (25%) fee for Class Counsel[1] from the common fund is supported by Class Counsel having created a significant common fund, despite a vigorous defense by Defendants led by highly-qualified defense counsel and substantial challenges to both class certification and on the merits.

In giving their approval of the Settlement, the Class will implicitly approve the 25% fee request when they opt-in to the settlement, as the Waiver and Release Forms (Exhibit C to the Confidential Settlement Agreement) specifically explain their individual settlement payments are net of a 25% fee recovery.

And though the Settlement provides for a 25% fee, it is noteworthy that numerous class members who consented to join this lawsuit before it was certified as a collective action each executed Representation Agreements with Class Counsel that provided for a thirty-three and a third percent (33.3%) fee.  Thus, *all* of the Participating Class Members will consent to a 25% fee recovery, and some previously consented to a higher amount.

A lodestar cross-check further confirms that the 25% fee falls well within the range of reasonableness, and is in line with (or, in fact, lower than) comparable settlements that negotiated court-approved fee awards.

**II.    THE TWENTY-FIVE PERCENT FEE IS REASONABLE.**

   **A.    The Blended Percentage-Of-The-Recovery Method Is Appropriate For Common Fund Settlements.**

The Supreme Court has approved the percentage of common fund method for calculating attorneys' fees in class actions.  *See Blum v. Stenson*, 465 U.S. 866, 900 n.16 (1984) ("[U]nder the 'common fund doctrine' a reasonable fee is based on a percentage of the fund bestowed on the class"); *Boeing Co. v. Van Germert*, 444 U.S. 472, 478 (1980) ("[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole.").  Almost all of the Circuits have held that the district court has discretion to use either the percentage or lodestar method to award fees. *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 49 (2d Cir. 2000).  While the Fifth Circuit has not explicitly endorsed the percentage method, neither has it explicitly disapproved of the method and it has acknowledged the propriety of the percentage fee method where each member of a class has an "undisputed and mathematically ascertainable claim to part of [a] judgment."

---

[1] While Plaintiffs acknowledge the technical term is "collective action" under the FLSA, for ease of reference the term "class" is often used, as many courts (including the U.S. District Court for the Eastern District of Louisiana) have recognized.  *See Camp v. Progressive*, 2004 WL 2149079 (E.D. La. 2004) (Wilkinson, Mag. J.); *Donohue v. Francis Servs.*, 2004 WL 1161366 (E.D. La. 2004) (Barbier, J.).

*Strong v. Bellsouth Telecommunications, Inc.*, 137 F.3d 844, 852 (5th Cir. 1998); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 651 (E.D. La. 2010) (Fallon, J.).

"[C]ourts find that the percentage method provides more predictability to attorneys and class members or plaintiffs, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys." *In re Vioxx*, 760 F. Supp. 2d at 651. The lodestar method of calculating fees has been pervasively criticized as "'difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation'" – which is why the "vast majority of Courts of Appeals have approved or mandated the use of the percentage method." *In re OCA, Inc. Sec. and Derivative Litigation*, 2009 WL 512081, *18 (E.D. La. 2009) (Vance, J.) (quoting *Manual of Complex Litigation* (4th ed.) § 14.121) (collecting 1st, 2d, 3d, 6th, 7th, 9th, 10th, 11th and D.C. Circuit cases).

Numerous district courts within the Fifth Circuit have applied a "blended" percentage method to determine a reasonable fee award – allowing a percentage method so long as the *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) factors for adjusting a lodestar by a multiplier are assessed as well (i.e., a "blend" of the percentage and lodestar methods and the *Johnson* factors for setting reasonable attorneys' fees). *In re Vioxx*, 760 F. Supp. 2d at 651-52 (collecting cases). The blended percentage approach has recently been described as entailing the following analytical steps:

> "[T]he Court will first determine the valuation of the benefit received by the claimants and then select an initial benchmark percentage. The Court will then determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case. Finally, the Court will conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award. The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method."

*In re Vioxx,* 760 F. Supp. 2d at 652.

There are at least eight **Eastern District** of Louisiana opinions using the percentage method to grant fees to class counsel:

**(1)** *In re Vioxx*, 760 F. Supp. 2d at 651-52 (applying blended percentage method to hold that 6.5% of total $4.85 billion settlement amount, or $315,240,000, was a reasonable common fund fee award);

**(2)** *In re OCA*, 2009 WL 512081 (applying blended method to approve award of 28.5% of the common fund for fees (for a total fee of $1,852,500) and an additional $179,466.05 in costs);

**(3)** *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714 (E.D. La. 2008) (Berrigan, J.) (applying blended percentage method to approve award of 24% of the common fund for fees in FLSA case and noting that such amount is "lower than the caselaw would support");

2

    **(4)**    *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 850-61 (E.D. La. 2007) (Fallon, J.) (settlement left issue of fees entirely to the court's discretion, which opted to use a blended percentage approach, with defendant agreeing to pay attorneys' fees over and above the class recovery);

    **(5)**    *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 628-29 (E.D. La. 2006) (Vance, J.) (applying blended percentage method to approve award of fees of 29% and costs of 2.5% of the common fund);

    **(6)**    *In re Harrah's Entertainment, Inc. Secs. Litig.*, 1998 WL 832574, *4 (E.D. La. 1998) (Clement, J.) (applying blended percentage method to approve award of 26% of the common fund for attorney's fees);

    **(7)**    *In re Prudential-Bache Energy Income Partnerships Sec. Litig.*, 1994 WL 150742 (E.D. La. 1994) (Livaudais, J.) (adopting blended percentage method to assess fee and cost award); and

    **(8)**    *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993) (Mentz, J.) (applying blended percentage method to approve award of almost $32 million, approximately 18% of the common fund, on $170 million common fund settlement).[2]

    **B.**    **The Benchmark Percentage.**

Historically, attorney fee awards have ranged from between 20-50% of the total common fund created and average around 25-33.3% of the recovery. Newberg & Conte, *Newberg on Class Actions* § 14.6 (4th ed. 2002); *Manual for Complex Litigation* (4th ed. 2004) § 14.121 (25% of a common fund "represents a typical benchmark"); *see also In re Activision Sec. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989) (noting that fee awards in common fund cases "almost always hover[] around 30% of the fund created by the settlement"); *Harrah's*, 1998 WL 832574 *4 (recognizing that the "majority of common fund fee awards fall between twenty and thirty percent" and that "[i]t is not unusual, however, for district courts in the Fifth Circuit to award percentages of approximately one third," with fifty percent as an "upper limit").

An oft-cited empirical study of attorneys' fees in class action settlements, Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004), reports that a "scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases." Eisenberg & Miller, *supra*, at 28; *Turner,* 472 F. Supp. 2d at 862-64 (quoting same). "In other words, the higher the

---

[2] *See also In re Enron Corp. Sec., Derivatives & ERISA Litig.*, 586 F. Supp.2d 732, 745 (S.D. Tex. 2008) ("Indeed, numerous district courts in this Circuit have applied the percentage method alone in awarding attorneys' fees in common fund cases . . . ."); *Shaw v. Toshiba America Information Systems*, 91 F. Supp. 2d 942, 966-67 (E.D. Tex. 2000) (listing 20 district court cases in the Fifth Circuit utilizing the percentage approach); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1133 (W.D. La. 1997) (setting a maximum reserve of 36% for attorney's fees); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 501-03 (N.D. Miss. 1996) (adopting 25% benchmark for fees in common fund cases).

recovery, the lower the percentage." *Turner*, 472 F. Supp. 2d at 864. Thus, lower percentage fees awards are typically associated with so-called "mega-fund" cases with common funds in excess of $100 million. *Id.* (involving common fund of $195 million).

    **C.**    **The Lodestar Cross-Check.**

        **1.**    **Reasonable hours expended.**

Under the Representation Agreement with the initial Named Plaintiffs and early opt-ins (i.e., those additional plaintiffs who submitted their consents to join this action before the case was conditionally certified as a collective action), Class Counsel was to receive 33⅓% of any recovery from Defendants. According to the terms of the negotiated settlement, Class Counsel will receive a reduced contingency interest of only 25% of the common fund. Thus, the negotiated settlement already reduces Class Counsel's fee recovery. Here, the Plaintiffs' lead attorneys, J.P. Hughes, Jr. and Michael A. Starzyk, also reviewed the billing entries for this matter, and Class Counsel will lodge with Judge Wilkinson a copy of its complete billing statement for *in camera* review to spot check individual time entries. *See In re Enron Corp.*, 586 F. Supp. 2d at 753.

        **2.**    **Reasonable hourly rates charged.**

The court determines the reasonable hourly rate by looking at the "prevailing market rate for similar services by similarly trained and experienced lawyers in the relevant legal community." *Prater v. Commerce Equities Mgmt Co.*, 2008 WL 5140045, *3 (S.D. Tex. 2008). Class Counsel commenced work on this matter in January, 2011. To date, Plaintiffs have already incurred the fees documented in the detailed billing statements that will be lodged with the Court for its *in camera* review in prosecuting their claims against Defendants, all of which are reasonable and necessary – and **Plaintiffs will continue to incur additional fees to consummate the administration of this settlement involving 544 eligible class members and responding to a Petition for Intervention recently filed by the plaintiffs in the Sullivan case (discussed further below)**.

The 2011 Edition of *The Survey of Law Firm Economics* conducted and published by The National Law Journal and ALM Legal Intelligence surveyed lawyers in Louisiana and noted that the *average* billing rates for "partner-level" attorneys (i.e., those practicing over ten years) across general practice areas were $334 (16-20 years); $342 (21-30 years); and $349 (31 or more years) and the *average* billing rates for "associate-level" attorneys were $194 (under 2 years); $213 (2-3 years); $227 (4-5 years); $267 (6-7 years); and $273 (8-10 years).

In another 2011 Billing Survey published by the National Law Journal and ALM Legal Intelligence, the rates for the New Orleans market, in particular, were assessed through data supplied by the Phelps Dunbar firm of approximately 280 attorneys, which showed partner high and average billing rates at, respectively, $465 and $281, and associate high and average billing rates at, respectively, $245 and $189.

Class Counsel's individual billing rates and years of practice are:

| | |
|---|---|
| Joseph E. Fieschko, Jr.: | $350 (J.D., 1978)[3] |
| J.P. Hughes, Jr.: | $350 (J.D., 1991)[4] |
| John R. Linkosky: | $350 (J.D., 1992)[5] |
| Michael A. Starzyk: | $400 (J.D., 1993)[6] |
| Stephen R. Ricks | $300 (J.D., 1993) |
| April L. Walter: | $375 (J.D., 1996)[7] |
| Raven Applebaum: | $275 (J.D., 2003)[8] |
| Nicholas Brown: | $275 (J.D., 2005)[9] |
| Hessam Parzivand: | $225 (J.D., 2010)[10] |
| J. Paul Rinnan | $150 (J.D., 2010) |

Class Counsel have collected their billing rates for this case for other matters.

### 3. The requested fees are below those in comparable settlements.

When Class Counsel's cumulative lodestar is divided into its fee recovery, the resulting multiplier is 2.17. In performing a lodestar cross-check, the court considers the multipliers used in comparable cases. *See In re Enron Corp.*, 586 F. Supp. 2d at 752. In *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002), the Ninth Circuit performed a survey of multipliers and found a "range of 0.6-19.6, with most (20 of 24, or 83%) from 1.0 and 4.0 and a bare majority (13 of 24, or 54%) in the 1.5-3.0 range." Much additional data can be cited for the proposition that a multiplier of 2.17 is not unusual and has been regularly awarded, as cogently summarized by the court in *In re Enron Corp.*, 586 F. Supp. 2d at 798-801.

### 4. The *Johnson* factors.

As already noted, the Court may also use the *Johnson* factors endorsed by the Fifth Circuit in performing a lodestar cross-check of a common fund fee award. The twelve *Johnson* factors for adjusting the lodestar using a multiplier are: **(1)** the time and labor required; **(2)** the novelty and difficulty of the question; **(3)** the skill requisite to perform the legal service; **(4)** the preclusion of other employment by the attorney due to the acceptance of the case; **(5)** the customary fee; **(6)** whether the fee is fixed or contingent; **(7)** time limitations imposed by the client or the circumstances; **(8)** the amount involved and the residuals obtained; **(9)** the experience, reputation, and ability of the attorneys; **(10)** the "undesirability" of the case; **(11)** the

---

[3] *See* Fieschko Affidavit submitted in support of Plaintiffs' Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23 (hereafter "Fieschko Affidavit").
[4] *See* Hughes Affidavit submitted in support of Plaintiffs' Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23 (hereafter "Hughes Affidavit").
[5] *See* Linkosky Affidavit submitted in support of Plaintiffs' Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23 (hereafter "Linkosky Affidavit").
[6] *See* Starzyk Affidavit submitted in support of Plaintiffs' Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23 (hereafter "Starzyk Affidavit").
[7] *See* Starzyk Affidavit, ¶ 6.
[8] *See* Starzyk Affidavit, ¶ 7.
[9] *See* Hughes Affidavit, ¶ 8.
[10] *See* Starzyk Affidavit, ¶ 8.

nature and length of the professional relationship with the client; and **(12)** awards in similar cases. *Von Clark v. Butler*, 916 F.2d 255, 258 n.3 (5th Cir. 1990).

Not all of the *Johnson* factors are always applicable. *See, e.g., In re OCA*, 2009 WL 512081 at *21; *In re Harrah's*, 1998 WL 832574 at * 4. And under Fifth Circuit precedent, the "most critical factor" is the "degree of success obtained." *Singer v. City of Waco*, 324 F.3d 813, 829 (5th Cir. 2003); *Prater*, 2008 WL 5140045, *3; *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006); *In re Enron Corp.*, 586 F. Supp.2d at 756-57.

### i. The extraordinary results achieved (Factor 8).

As detailed in the parties' Confidential Settlement Agreement, the participating class members will receive net settlement payments that are substantially greater than those received in typical FLSA class actions. Charlotte S. Alexander, the Deputy Director of the National Institute for Teaching Ethics and Professionalism and a Post-Graduate Research Fellow at Harvard Law School, recently published a law review article on an extensive study of FLSA collective actions, entitled "*Would An Opt In Requirement Fix The Class Action Settlement? Evidence From The Fair Labor Standards Act*." 80:2 MISS. L.J. 443 (2010). As part of her study (which is highly critical of FLSA litigation), she identified all FLSA cases filed in the Southern District of Florida (which leads the nation in FLSA cases with 28.7% of all such cases filed in the U.S.).[11] Ms. Alexander found that in the 25 collective actions in the Southern District of Florida for which she could obtain recovery data that the ratio of plaintiffs' recovery to plaintiffs' losses ranged from a low of 4% to a high of 100% (but in that unique case, the total loss was only a miniscule $2,063). More importantly, she found the median recovery-to-loss ratio was 28%. *Id.*, Figure 9 at pp. 488-89.

Additionally, through the diligent efforts of Class Counsel (including, for example, by fielding hundreds of calls and e-mails from putative class members and giving class members unfettered access to the lead attorneys' personal cell phone numbers for calls at all hours of the day or night and on weekends), this case involved an exceptionally high opt-in rate, with nearly 42% of putative class members electing to join this action (544/1,304 putative class members). Such a result is in sharp contrast with the often low levels of participation in FLSA collective actions. In Ms. Alexander's study, she was able to gather data on the opt-in rates in thirty-eight FLSA collective actions. The plaintiff opt-in rates in these cases ranged from 0% to 48%, with a median of 15% and 30 of the 38 cases with opt-in rates below 20%. *Id.*, pp. 466-67 & Figure 10 at pp. 489-91. Another analysis of FLSA opt-in rates in federal courts around the country that Ms. Alexander cites calculated the average opt-in rate to be 15.71%. *Id.*, p. 468 (citing Andrew C. Brunsden, *Hybrid Class Actions, Dual Certification, and Wage Law Enforcement in Federal Courts*, 29 BERKELEY J. EMP. & LAB. L. 269, 292-94 (2008)).

Here, Class Counsel indisputably obtained extraordinary results for the participating class members.

---

[11] *See Hamm v. TBC Corp.*, 597 F. Supp. 2d 1338, 1339 (S.D. Fla. 2009) (citing data compiled by the Administrative Office of the U.S. Courts).

### ii. *The novel and difficult questions and skills required (Factors 2-3, 7 & 9).*

The other *Johnson* factors also weigh heavily in favor of an enhancement of fees. This case presented a novel and difficult question (the second factor) of whether a reasonable relationship should exist between a guaranteed salary and the final amount paid to employees. There were few authorities backing the positions of either side on this particular question causing much uncertainty about the final result. *See* Docket Nos. 234, Plaintiffs' Motion for Partial Summary Judgment (Not Paid on a "Salaried Basis"); 266, Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment & 285, Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment (Not Paid on a "Salaried Basis").

Despite these hurdles, Class Counsel engaged the defense on this core issue in early depositions, and filed Plaintiffs Motion for Partial Summary Judgment on the salaried basis issue within four months of the parties' initial Scheduling Conference with the Court and within two months of taking their first deposition in the case – with mediation occurring shortly thereafter. Indeed, Class Counsel together has significant experience with the federal Fair Labor Standards Act. *See* Fieschko Affidavit; Linkosky Affidavit; Hughes Affidavit & Starzyk Affidavit (referenced at footnotes 3-10, *supra*). The third and seventh *Johnson* factors thus militate towards enhancement of the fee.

While the settlement payments are based on undisputed pay rates, hours worked and overtime computation method, this does not negate the significance of the results obtained, as Class Counsel faced an experienced and skilled opponent,[12] three exemption defenses were asserted,[13] and the plaintiffs were highly paid and many of them highly skilled – thus, making the case more difficult.

### iii. *The significant labor required (Factor 1).*

The extraordinary results that Class Counsel achieved required significant labor (the first factor). Discovery included:

- The exchange of thousands of pages of documents (with Defendants producing over 10,500 Bates-labeled documents and Plaintiffs producing over 1,100 Bates-labeled documents);

---

[12] Defendants are represented by Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP ("Jones Walker") and Crawford Lewis. On its website (www.joneswalker.com), Jones Walker describes how the firm has grown since its inception in 1937 to become one of the largest law firms in the Gulf South, with approximately 375 attorneys in Alabama, Arizona, the District of Columbia, Florida, Louisiana, Mississippi, and Texas. On December 6, 2011, Jones Walker issued a Press Release concerning the firms' "top tier" rankings among metropolitan law firms listed in *The U.S. News & World Report* rankings, including its "Tier 1" ranking in New Orleans in the "Employment Law-Management" practice.

[13] Defendants' unwavering position was, and continues to be, that it properly classified the adjusters/evaluators as overtime exempt under at least three exemptions (the administrative exemption, the highly-compensated employee exemption, and the executive exemption) (*see, e.g.,* Docket No. 156, Defendants' Response to Plaintiffs' Motion for Conditional Certification as a Collective Action).

- Eighty-eight (88) Plaintiffs responding to First Sets of Interrogatories and Requests for Production propounded by Defendants, with sixteen (16) Interrogatories and twenty (20) Requests for Production contained in each set;

- Plaintiffs' depositions in New Orleans and Baton Rouge of:

    - Bob Simon (Defendants' Director of Operations and second in command at the company);
    - Charlie Bilbe (Defendants' Director of Environmental Services and person primarily responsible for overseeing the work done on the BP Oil Spill Project);
    - Eddie Landrum (one of only a couple men tasked with calling people to recruit them to come work for Worley as an adjuster/evaluator on the BP Project); and
    - David Harvey, Jr. (an adjuster/evaluator, Team Manager who conducted the vast majority of the orientation programs for the adjusters/evaluators hired to work on the BP Oil Spill Project and is now employed by Defendants as a "Regional Liaison" responsible for managing five offices, as well as a travel team, on the Project).

- Obtaining deposition testimony of several witnesses taken in the related State court action of *Michael Sullivan, et al. v. The Worley Companies, et al.*, Docket No. 599,055, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana (hereafter the "*Sullivan* Case"), including the depositions of:

    - Bilbe;
    - Landrum;
    - Allen Carpenter (Defendants' Manager of Corporate Compliance and a frequent declarant in this action);
    - Darryl Martin (Defendants' Director of Training, Regulatory & Compliance);
    - Steve Castleberry (another recruiter, like Landrum, who recruited plaintiffs to work on the BP Project);
    - Plaintiff Michael Sullivan;
    - Plaintiff Jimmy Phillips;
    - Plaintiff Johnny Knighten;
    - Plaintiff Charles Baldwin; and
    - Plaintiff Ronald Dickerson.

- Defendants taking the deposition of lead Plaintiff John J. Altier, who traveled from his work in Chicago to attend his deposition in New Orleans, and Plaintiff Sandra Brennan, who traveled from her home in Florida to attend her deposition New Orleans.

- Plaintiffs' service of the following written discovery requests to which Defendants responded:

    - Four Sets of Requests for Production to Worley Catastrophe Services ("WCS") (collectively containing 177 Requests);
    - Two Sets of Requests for Production to Worley Catastrophe Response ("WCR") (collectively containing 177 Requests);
    - Three Sets of Interrogatories to WCS (collectively containing 11 Interrogatories); and
    - Two Sets of Interrogatories to WCR (collectively containing 7 Interrogatories).

The Dockets for these consolidated cases include **over 360 filings**. The parties' more significant motion work includes:

- Plaintiffs' Motion for Conditional Certification as a Collective Action;
- Plaintiffs' Motion for Partial Summary Judgment (Not Paid on a "Salaried Basis");
- Plaintiffs' Motion for Partial Summary Judgment (Defendants' "Good Faith Defense" to Liquidated Damages);
- Plaintiffs' Motion for Remedial Relief from Defendants' Retaliation Threats to Class Members;
- Plaintiffs' Motion to Enjoin Defendants from Including Misleading Statements in the Class Notice Issued in the *Sullivan* Case; and
- Numerous Motions to Seal documents, which were filed pursuant to the parties' Stipulated Rule 26(c) Protective Order and Defendants' designation of documents as "Confidential" thereunder, and Objections thereto.

> iv.     *The risks (Factors 6 & 10).*

Furthermore, Class Counsel assumed one-hundred percent of the risk of the litigation working on a contingency basis with no security that they could prove that Defendants did not pay on a salary basis and that plaintiffs were not exempt insurance adjusters; no guarantee that both Worley Catastrophe Response and Worley Catastrophe Services could be held accountable as employers; and no assurance that either entity would be solvent when the time for payment arrived. These issues demonstrate the risk Class Counsel took meriting enhancement under the sixth *Johnson* factor, but also the undesirability of the case under the tenth *Johnson* factor. *In re Enron*, 586 F. Supp. 2d at 791 (stating that enhancement was warranted when "there was no obvious deep pocket source available from which to seek any recovery," and "the contingent fee agreement placed the risk, which was substantial, completely on Lead Counsel").

> v.     *Similar fees/awards (Factors 5 & 12).*

The Eastern District of Louisiana cases cited in Section II(A) further demonstrate that the 25% fee herein is well within the range of the customary fee (the fifth and twelfth factors) for common fund class settlements. *In re OCA,* 2009 WL 512081 (approving 28.5% of common

9

fund for fees); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d at 628-29 (approving 29% of common fund for fees); *In re Harrah's Entertainment, Inc. Secs. Litig.*, 1998 WL 832574 at *4 (approving 26% of common fund for fees); *In re Shell Refinery*, 155 F.R.D. at 552 (approving 18% of common fund for fees).

### vi. Preclusion of other employment (Factor 4).

Finally, Class Counsel's investment in the case precluded it from seeking other employment and warrants enhancement under the fourth *Johnson* factor.

### III. DIVISION OF THE FEE AMONG CLASS COUNSEL IS NOT AN ISSUE.

Class Counsel have an agreement on how the attorneys' fees are to be divided and have no disputes regarding the interpretation of their agreement. *See* Exhibit E to Confidential Settlement Agreement. The Fifth Circuit has allowed Plaintiffs' counsel to agree on the division of fees among themselves. *Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992); s*ee also Turner*, 472 F. Supp. 2d at 869-70 (allowing attorney's to determine allocation of fees by agreement and retaining jurisdiction for purposes of appointing a special master if agreement was not reached) *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 534 (N.D. Miss. 2003) (same). The division of fees by unanimous agreement of counsel is thus not a hindrance to final settlement of this case.